IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID BARBOZA,

             Plaintiff,                         No. CIV S-2:08-519-KJM-GGH

      vs.

CALIFORNIA ASSOCIATION OF
PROFESSIONAL FIREFIGHTERS, et al.,

             Defendants.
                                  <u>ORDER</u>
_____/

        This is an action brought under the federal Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.  Plaintiff was a firefighter with the city of

Tracy, and a participant in the long-term disability plan (the "Plan") offered by  defendant

California Association of Professional Firefighter ("CAPF"); defendant California

Administration Insurance Services, Inc. ("CAIS") administered the Plan.  (Collectively, CAPF

and CAIS are referred to as "defendants.")  Plaintiff seeks damages in the form of long-term

disability ("LTD") payments plaintiff maintains defendants improperly withheld from him.

Defendants maintain they granted plaintiff's claim for LTD benefits, but properly offset the

amount of  benefits due plaintiff in accordance with the express terms of the Plan.  Presently

1  before the court are the parties' cross motions for summary judgment (ECF 75-1 and 78,

2  respectively).  Also before the court is plaintiff's motion for summary judgment on defendant's

3  counterclaim (ECF 77).  For the reasons set forth below, the parties' cross motions for summary

4  judgment are granted in part and denied in part.  Plaintiff's motion for summary judgment on

5  defendant's counterclaim is granted in part and denied in part.

6  I.      BACKGROUND

7          A.      Procedural History

8                  Plaintiff filed his complaint on March 6, 2008, seeking injunctive relief and

9  damages for alleged violations of ERISA.  (Pl.'s Compl. ("Compl."), ECF 2.)  Defendants

10  answered the complaint on May 12, 2008.  (Defs.' Answer, ECF 7.)  On May 8, 2009, plaintiff

11  moved for judgment on the administrative record.  (ECF 14.)  Defendants filed a cross-motion

12  for summary judgment on May 15, 2009, arguing plaintiff's claims should be dismissed because

13  he failed to exhaust his administrative remedies.  (ECF 18.)  The court issued a memorandum

14  and order on June 23, 2006, granting defendants' cross-motion for summary judgment and

15  denying plaintiff's motion for judgment on the administrative record.  (*See* Order, ECF 31.)  The

16  court dismissed plaintiff's complaint "without prejudice for plaintiff's failure to exhaust

17  administrative remedies," without reaching the merits of plaintiff's claims for benefits.  (*Id.* at

18  15:20-21.)

19                 Plaintiff appealed to the Ninth Circuit on August 21, 2009.  (ECF 40.)  On

20  July 25, 2011, the Ninth Circuit issued a published opinion, reversing the court's determination

21  that plaintiff failed to exhaust his administrative remedies.  *See Barboza v. Cal. Ass'n Prof'l*

22  *Firefighters*, 651 F.3d 1073 (9th Cir. 2011).  The court specifically held that the Plan failed to

23  comply with department of labor regulations  regulations by not rendering a decision on

24  plaintiff's claim for long-term disability benefits within 90 days.  *See id.* at 1080.  Plaintiff's

25  claims were therefore deemed exhausted.  *Id.*  The Ninth Circuit remanded to this court to

26  address plaintiff's claims on the merits.

On January 27, 2012, defendants filed a motion for leave to file a counterclaim under 29 U.S.C. § 1132(a)(3)(B), "which allows plan fiduciaries to obtain equitable relief." (Mot. for Leave to Amend, ECF 58 at 2:2-3.)  At the hearing on defendants' motion, the court granted defendants' leave to amend to file a counterclaim.  (Transcripts of Proceedings, ECF 65 at 11:15-19.)  Defendants filed their counterclaim on March 2, 2012 (ECF 64), and plaintiff answered on March 23, 2012 (ECF 66).

Defendants filed their motion for summary judgment on April 11, 2012.  (Defs.' Mot. for Summ. J. ("Defs.' MSJ"), ECF 75-1.)  On April 13, 2012, plaintiff filed its cross-motion for summary judgment.  (Pl.'s Mot. for Summ. J.  ("Pl.'s MSJ"), ECF 78.)  Plaintiff also filed its motion for summary judgment on defendants' counterclaim on April 13, 2012.  (Pl.'s Mot. for Summ. J. on Defs.' Countercl. ("Pl.'s CC MSJ"), ECF 77.)   Each of the aforementioned motions is opposed.

B.    Factual Background

The court, in its order on the parties' original cross-motions for summary judgment, recounted the relevant facts of this case in detail, as follows:

> CAPF offers a long term disability plan to eligible firefighters in California.  CAIS is the independent third-party administrator for the CAPF Plan.  Prior to March 2006, plaintiff was a firefighter for the City of Tracy and a participant in the CAPF Plan.  Plaintiff held the rank and position of Battalion Commander and, in that position, did not routinely respond to fires.  In or about December 2005, the City decided to eliminate the Battalion Commander position.  By letter dated March 2, 2006, plaintiff was given an official notice of layoff from the City Manager.  According to the letter, plaintiff had four choices: (1) he could retire if eligible by virtue of his age and years of service; (2) he could accept a layoff effective March 21, 2006; (3) he could resign from the Tracy Fire Department, or (4) if determined by the Personnel Manager to be qualified, he could accept a demotion to Fire Captain.

> Plaintiff was too young to retire and did not want to accept a layoff or resign.  He was also not physically qualified to accept the Fire Captain position.  Plaintiff injured his back in 1993 or 1994 and filed a claim for benefits under the workers' compensation system.  His disability was found to be permanent and stationary, and he was given a permanent work restriction for "no very heavy lifting" by his doctor.  Plaintiff was able to continue work, and he received regular treatments from a chiropractor, but his back never got better.  In 1999, he was promoted to Division Chief, but the pain from his prior back injury was

getting worse.   The position changed to Battalion Commander in 2003, a position that was primarily a supervisory one involving mostly desk work.  Despite this change, the pain in plaintiff's neck, back and shoulders became more of a problem in 2003-2004.  The pain was spreading his back and he developed peripheral neuropathy in his legs, which caused pain, numbness and tingling.  In 2005, he was rated "marginal" in his mandatory agility testing.

In early March 2006, Tracy Fire Chief Bosch called plaintiff in for a meeting to inquire whether in light of his physical condition, plaintiff could safely do the job of Fire Captain.  Plaintiff told Bosch he did not know if he could safely perform the job physically and asked if there were any other positions available.  Chief Bosch said that there were not and sent plaintiff to Dr. Patel to determine if he was physically qualified to perform the duties of the Fire Captain position.

Plaintiff reported to work as a Fire Captain on or about March 21, 2006.  He was subsequently evaluated by Dr. Patel on March 27, 2006.  Dr. Patel found plaintiff physically unqualified for the Fire Captain position due to his previously sustained back injury and peripheral neuropathy.  Dr. Patel placed permanent work restrictions on plaintiff that prevented him from repetitive lifting above 40 pounds, repetitive bending at the waist, and repetitive stooping, and he could only occasionally work at height or climb a ladder.

The City placed plaintiff on administrative leave the following day.   After two months of paid administrative leave, the City gave plaintiff a disability retirement from the position of Fire Captain.

On or about March 29, 2006, plaintiff contacted CAIS to discuss filing a long-term disability claim because he was physically unable to perform the duties of Fire Captain.  CAIS advised plaintiff to review the benefits available to him under California Labor Code § 4850, as CAIS understood plaintiff's acceptance of retirement benefits may preclude him from receiving benefits under Section 4850, and that any long-term disability claim made under the CAPF Plan would be offset by the benefits available to him under that code section.   CAIS also advised plaintiff to file a workers' compensation claim for cumulative trauma to his back.   Defendants assert plaintiff advised CAIS that he would have his workers' compensation attorney file a workers' compensation claim for cumulative trauma and seek benefits under Section 4850.  As such, defendants maintain they believed that plaintiff would receive these benefits.  Plaintiff contends, to the contrary, that he told CAIS that he would receive Section 4850 pay only until his disability retirement went through, as his physical condition was permanent and stationary, thereby precluding him from receiving Section 4850 benefits.   Plaintiff filed a workers' compensation claim, and CAPF subsequently filed a lien in the workers' compensation proceeding.  Plaintiff disputes that defendants' lien was properly filed and perfected.

Plaintiff did not pursue the statutory benefits available under Section 4850 and, instead, accepted retirement due to permanent disability.  He was granted disability retirement by the City effective May 16, 2006.  On May 31, 2006, he filed a written claim for disability benefits under the CAPF Plan.   After receiving plaintiff's claim, CAIS asserts it made several attempts to communicate with plaintiff and his attorney to discuss the issue of Section 4850 benefits, but it

4

received no response.  As a result, CAIS presumed that plaintiff had applied for and was receiving the Section 4850 benefits it believed he was entitled to, and thus, there was no immediate need for a determination on plaintiff's long-term disability claim.  Plaintiff contends CAIS's presumption was unreasonable since it knew plaintiff had been retired for a permanent disability since May 16, 2006, which plaintiff contends made him ineligible for Section 4850 benefits.  Plaintiff asserts he was entitled under the Plan to a claims decision within 45 days of filing his claim.

On October 7, 2006, plaintiff faxed a letter to CAIS complaining that he had not been given any explanation for why he was not being paid long-term disability benefits from defendants and requesting payment of his benefits because his injuries were permanent.  CAIS responded on October 13, 2006, stating that plaintiff needed to obtain legal advice immediately before allowing his first PERS retirement payment to be deposited in his account, as CAIS believed plaintiff could no longer receive further Section 4850 benefits once he began receiving PERS payments.  CAIS attempted to contact plaintiff's attorney to discuss this issue with him as well, but counsel never responded to CAIS.

On May 2, 2007, CAPF received a letter from plaintiff inquiring why he was not receiving benefits for his claim.  This was the first time since October 2006 that CAPF had been contacted by plaintiff.  On May 18, 2007, CAIS denied plaintiff's claim for disability benefits on the ground there was "no documentation on file to show that [plaintiff was] disabled from [his] Own Occupation as a chief officer and you were able to work full duty as a Battalion Chief until the city discontinued this position."

Plaintiff appealed CAIS's decision on July 31, 2007.  On November 16, 2007, plaintiff submitted additional medical evidence in support of his disability claim.  [On the day before the hearing, CAPF notified plaintiff that it would be addressing  Section 4850 pay. (Supplemental Decl. of Geoffrey White, ECF 16 ¶ 3.)] [1] On February 20, 2008, the Claims Committee of the Board of Directors ("Claims Committee") heard plaintiff's appeal.  Both plaintiff and his attorney attended the hearing.  At the conclusion of the hearing, the Claims Committee took the appeal under submission and advised plaintiff it would issue a decision forthwith.

On March 6, 2008, two weeks following the appeal hearing and before the Claims Committee rendered its decision, plaintiff filed the instant lawsuit against defendants.  The CAPF Plan, however, required an additional appeal to the CAPF Executive Board and then a 30-day period of good-faith negotiation to work out any disputes prior to filing suit on a claim.

On April 21, 2008, the Claims Committee issued its decision, granting plaintiff's disability claim but paying benefits subject to the offsets permitted by the Plan, which included payments under Section 4850 that plaintiff was entitled to, and any other income and/or workers' compensation settlement amounts plaintiff may receive.

---

[1] This sentence did not appear in the court's original order.

1          Thereafter, plaintiff settled his workers' compensation claim with the City
2     through a compromise and release.  He settled this claim without notifying CAPF.
      The parties dispute whether CAPF was entitled to participate in the settlement
      negotiations.  Defendants contend that under the provisions of the Plan, CAPF
3     must be a party to and approve of all settlements; in the event it is not included,
      the Plan provides that CA[PF] may take an offset of the entire settlement, even if
4     that settlement is characterized as a buy-out of future medical payments.
      Defendants assert that despite CAPF's lien and their attorney specifically advising
5     plaintiff's counsel of these provisions of the Plan, plaintiff settled his claim with
      the City without notifying CAPF.  Thus, defendants argue they may properly
6     offset plaintiff's benefits by the entire settlement amount of $18,000.00.
      Defendants also emphasize that plaintiff signed a Benefit Election Form expressly
7     acknowledging his obligation to repay any amounts received from a workers'
      compensation settlement, and that these settlement proceeds would be taken as an
8     offset to any benefits payable under the Plan.

9     (Order, ECF 31 at 2:23-9:16; *Barboza v. California Ass'n of Prof'l Firefighters,* 2009 WL

10    1770429, at *1-4 (E.D. Cal. June 23, 2009) (internal citations omitted).)

11    II.    Standard

12          Summary judgment is appropriate when the moving party demonstrates no

13    genuine issue as to any material fact exists, and that the moving party is entitled to judgment as a

14    matter of law.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

15    Under summary judgment practice, the moving party always bears the initial responsibility of

16    informing the district court of the basis of its motion, and identifying those portions of "the

17    pleadings, depositions, answers to interrogatories, and admissions on file together with the

18    affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

19    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

20    burden of proof at trial on a dispositive issue, a summary judgment motion may properly be

21    made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions

22    on file.'"  *Id.* at 324.  Indeed, summary judgment should be entered against a party who does not

23    make a showing sufficient to establish the existence of an element essential to that party's case,

24    and on which that party will bear the burden of proof at trial.  *Id.* at 322.  In such a circumstance,

25    summary judgment should be granted, "so long as whatever is before the district court

26    /////

1    demonstrates the standard for entry of summary judgment, as set forth in Rule 56(c), is

2    satisfied." *Id.* at 323.

3            If the moving party meets its initial responsibility, the burden then shifts to the

4    opposing party to establish that a genuine issue as to any material fact actually does exist.

5    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *First Nat'l*

6    *Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968).  In attempting to establish the existence

7    of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

8    required to tender evidence of specific facts in the form of affidavits, and/or admissible

9    discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The

10   opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

11   affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

12   242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

13   could return a verdict for the nonmoving party, *Id.* at 251-52.

14           In the endeavor to establish the existence of a factual dispute, the opposing party

15   need not establish a material issues of fact conclusively in its favor.  It is sufficient that "the

16   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

17   versions of the truth at trial."  *First Nat'l Bank*, 391 U.S. at 289.  Thus, the "purpose of summary

18   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

19   genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's

20   note on 1963 amendments).

21           In resolving the summary judgment motion, the court examines the pleadings,

22   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23   any.  Rule 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence

24   of the opposing party is to be believed, and all reasonable inferences that may be drawn from the

25   facts placed before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S.

26   at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

1   obligation to produce a factual predicate from which the inference may be drawn.  *Richards v.*

2   *Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir.

3   1987).

4             Finally, to demonstrate a genuine issue that necessitates a fact finder, the

5   opposing party "must do more than simply show that there is some metaphysical doubt as to the

6   material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find

7   for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586-87,

8   106 S. Ct. at 1356.

9   III.   <u>Cross-Motions for Summary Judgment</u>

10            A.   <u>Standard of Review</u>

11            Plaintiff contends the standard of review in this case should be de novo because

12  "[d]efendants violated DOL regulations in failing to provide a decision on Barboza's [a]ppeal

13  within 90 days," as required by 29 C.F.R. § 2560.  (Pl.'s MSJ at 12:6-8.)  This, plaintiff

14  maintains, was a blatant procedural violation necessitating de novo review, as explained in

15  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006).  Plaintiff also argues review

16  should be de novo because, "by raising th[e] issue regarding Section 4850 pay at the last minute

17  on the day before the hearing, the Plan prevented full development of the administrative record

18  and did not provide Barboza with a full and fair hearing."  (*Id.* at 13:9-11.)

19            Defendants argue there is no valid reason to alter the standard of review.

20  Specifically, citing the Supreme Court's decision in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105

21  (2008), and this court's decision in *Duvall v. Reliance Std. Life Ins. Co.*, 646 F. Supp. 2d 1188,

22  1198 (E.D. Cal. 2009), defendants maintain any delay in providing a decision on appeal should

23  not alter the standard of review because "[d]efendants acted in good faith in terms of complying"

24  with the deadline and "therefore, did not commit any egregious procedural violation."  (Defs.'

25  Opp'n to Pl.'s MSJ ("Def.s' Opp'n"), ECF 83 at 3:1-3.)  Defendants note that cases from the

26  Eastern District have held that "failure to adhere to the deadlines set forth in the regulations will

not alone warrant the use of a de novo standard of review." (*Id.* at 3:22-23.)   Defendants argue

that offsetting plaintiff's LTD benefits under Section 4850 was not a "new reason" to deny

benefits; indeed, defendants maintain  plaintiff admits the administrator brought up the issue of

4850 benefits long before the appeal.  (*Id.* at 7:9-11.)  Finally, defendants point to the fact that, in

*Duvall*, the court declined to alter the standard of review where plaintiff sought de novo review

for virtually the same reasons plaintiff seeks de novo review here.  *See Duvall*, 646 F. Supp. 2d

at 1199-1203.

Where a plan's language expressly confers discretionary authority upon the Plan

administrator, a federal court will review the administrator's decision for abuse of discretion.

*Abatie*, 458 F.3d at 967.  While a conflict of interest in the Plan administrator — that is, where

the administrator both funds a plan and evaluates claims for benefits — will not alter the

standard of review, the court must consider any conflict as a factor in determining whether the

administrator abused its discretion.  *Metro. Life Ins. Co.*, 554 U.S. at 115-16.  However, the

standard of review will rise to de novo "where the administrator violates the procedures

mandated by ERISA in a way that is 'so flagrant so as to alter the substantive relationship

between the employer and employee, thereby causing the beneficiary substantive harm.'"

*Duvall*, 646 F. Supp.2d at 1198 (quoting *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978,

985 (9th Cir. 2005)).

Here, plaintiff does not dispute that the plain language of the Plan expressly

confers discretion on the plan administrator.  (Pl.'s MSJ at 11:17-19.)  However, plaintiff asserts

that defendants' alleged procedural misconduct has altered the standard of review from abuse of

discretion to de novo.  Plaintiff's argument in this regard, however, runs afoul of relevant

precedent.

First,  this court's decision in *Duvall* undercuts plaintiff's contention that the

court should review de novo CAPF's decision regarding 4850 benefits because the Plan's

decision on plaintiff's appeal was untimely.  Beyond the legal rules set forth in *Duvall*, as set

forth above, the facts of that case are similar to the facts of this case.  Specifically, in *Duvall*, the court held that even though the plan administrator "failed to adhere to its own deadlines and ERISA regulations in rendering the appeal," mere "failure to adhere to the regulations' deadlines does not alone merit the use of a de novo standard of review." *Duvall*, 646 F. Supp.2d at 1199, 1202.

Second, plaintiff's contention that the standard of review should be de novo because defendants "rais[ed] the issue regarding Section 4850 pay at the last minute on the day before the hearing" is contrary to binding precedent.  (Pl.'s MSJ at 13:9-10.)  Plaintiff relies on language from *Saffon v. Wells Fargo Long-Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008), which states, "[a]fter all, coming up with a new reason for rejecting the claims at the last minute suggests that the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective evaluation."  Plaintiff omits, however, pertinent language directly preceding that quote, explaining that where an administrator does not give ample notice of the basis for a denial or offset, "[t]his procedural violation must be weighed by the district court in deciding whether [the administrator] abused its discretion." *Id.* at 871-72 (quoting *Abatie*, 458 F.3d at 974).  As was the case with defendants' alleged lack of adherence to regulatory deadlines, defendants' last minute notice of its intent to offset plaintiff's LTD benefits based on Section 4850 will constitute a factor in the court's decision regarding whether defendants abused their discretion, but will not alter the standard of review.

In conclusion, the court finds that defendants' alleged procedural violations were not "so flagrant as to alter the substantive relationship between the employer and employee," *Gatti*, 415 F.3d at 985, and thus, do not require de novo review of CAPF's decision to offset plaintiff's LTD benefits in accordance with Section 4850.

B.    California Labor Code § 4850

Plaintiff does not dispute that, according to the Plan terms, his LTD benefits were properly offset if he was eligible for the benefits provided by California Labor Code § 4850.

However, plaintiff argues CAPF abused its discretion by offsetting his LTD benefits because he was not eligible for benefits under Section 4850.  Plaintiff cites *Hawthorne v. Beverly Hills*, 111 Cal. App. 2d 723, 729 (1952) and *Perry v. WCA*, 28 Cal. App. 3d 828, 831 (1972) to support his contention that benefits under Section 4850 are only available "for periods of [t]emporary [d]isability, or periods in which the person is entitled to vocational rehabilitation maintenance allowance." (Pl.'s MSJ at 16:10-14.)  Plaintiff argues because his "Compromise and Release states that all Temporary Disability . . . has been paid," he was not eligible for benefits under Section 4850. (*Id.* at 16:17-18.)

Plaintiff also argues he was not entitled to vocational rehabilitation because "the Workers Compensation law was changed in 2004 . . . [such that] Section 139.5 applie[s] only to injuries before 2004." (*Id.* at 16:25-27.) "Accordingly, because any right for Barboza to obtain Vocational Rehabilitation Maintenance Allowance was eliminated by the statute after 2003, he had no right to Section 4850 pay under that prong as well." (*Id.* at 17:1-4.)  At bottom, plaintiff maintains defendants have no evidence of plaintiff's suffering an industrial injury resulting in temporary disability entitling him to Section 4850 benefits. (Pl.'s Opp'n to Def.'s MSJ ("Pl.'s Opp'n"), ECF 85 at 5:22-25.)

Defendants argue Section 4850 pay is a proper offset under the CAPF plan because plaintiff was eligible for the benefits provided by the statute.   Under the Plan, "[a]ny amount the Plan Member receives or is eligible to receive . . . pursuant to Sections 4800 or 4850 of the California Labor Code" shall be applied to reduce the participant's total benefits. (Defs.' MSJ, at 9:9-20.)  Defendants maintain plaintiff was eligible for vocational rehabilitation prior to his disability retirement because "[plaintiff] signed a declaration under penalty of perjury that the pain and aching in his back, neck, and shoulders became more of a problem in 2003-2004," prior to his disability retirement. (*Id.* at 11:3-5.)  Defendants insist that CAPF did not abuse its discretion in determining plaintiff's injury was "industrial," and thus, fell within the statute. (*Id.* at 3:19-20.)  Defendants support this contention by citing Dr. Patel's statement in March 2006,

1   that "[Barboza] can't do captain's job due to chronic [lower back] pain."  (Def.'s Opp'n at

2   10:27-28.)

3          Defendants also argue plaintiff's contention that Section 4850 benefits are only

4   available to those with temporary disability is expressly belied by the plain language of the

5   statute, which states that a firefighter is entitled to these benefits "whether temporarily or

6   permanently disabled."  (*Id.* at 11:5-18.)  Finally, defendants assert, even though California

7   Labor Code Section 139.5's provision regarding vocational rehabilitation applies only to injuries

8   before 2004, there is evidence that plaintiff was eligible for vocational rehabilitation regardless

9   because "[t]he symptoms, pain and/or numbness in both feet, began six to twelve months prior to

10  June of 2004, which indicates they began in 2003."  (*Id.* at 11:16-28.)

11         Section 4850 provides:

12         Whenever any person listed in subdivision (b), who is employed
           on a regular, full-time basis, and is disabled, whether temporarily
13         or permanently, by injury or illness arising out of and in the course
           of his or her duties, he or she shall become entitled . . . to a leave
14         of absence while so disabled without loss of salary . . . for the
           period of the disability, but not exceeding one year, or until that
15         earlier date as he or she is retired . . . .

16  CAL. LAB. CODE § 4850(a).  Included in subdivision (b) are "[c]ity, county or district

17  firefighters" such as plaintiff.  *Id.* § (b).

18         CAPF issued its decision on plaintiff's appeal of the plan administrator's denial

19  on April 21, 2008, finding "the claim should be accepted; however, any benefits to which

20  [plaintiff] would be entitled are subject to reduction and offsets according to the provisions of

21  the Plan."  (Administrative Record (hereinafter cited as "CAPF"), ECF 13 at 345.)  CAPF

22  /////

23  /////

24  /////

25  /////

26  /////

reasoned that:

> [T]he two months of Administrative Leave for which [plaintiff was] paid would be counted as § 4850 pay. [Plaintiff] would have been entitled to another ten months of full pay, which, combined with the two months [plaintiff] did receive, will completely offset 12 months of benefits that would otherwise have been payable under the Plan.

(CAPF 347.)

The court finds unavailing plaintiff's contention that defendants abused their discretion by offsetting plaintiff's benefits based on Section 4850 pay. According to the administrative record, plaintiff's physician, Dr. Patel, stated that plaintiff could not perform the fire captain's job because of lower back pain. (CAPF 226.) Dr. Patel also diagnosed plaintiff with peripheral neuropathy. (*Id.*) Indeed, plaintiff admits Dr. Patel "found him disabled from his job as a fire captain." (Pl.'s MSJ at 4.)

Because plaintiff could not perform the captain's job, and because the city had terminated the battalion commander position plaintiff previously held (CAPF 134-135), the city put plaintiff on administrative leave and gave him a disability retirement at a captain position. Plaintiff "agreed that the Administrative Leave he was on for the first two months would count as 4850 pay"; plaintiff nevertheless did not subsequently apply for the additional ten months of 4850 pay. (CAPF 341.) As such, there is sufficient evidence for the court to find that defendants reasonably concluded that plaintiff's disability entitled him to benefits under Section 4850. Defendants did not abuse their discretion in offsetting that amount against the total amount of plaintiff's disability payments as required by the express terms of the Plan.

The court also finds plaintiff's contention that Section 4850 "has consistently been construed as providing salary continuation benefits only for periods of temporary disability" is contrary to law. (Pl.'s MSJ at 16:10-11.) Plaintiff's contention is belied by the plain language of the statute, which states that a qualified individual is entitled to benefits under the statute regardless of whether disabled "temporarily or permanently." CAL. LAB. CODE §

13

4850(a).  The case law plaintiff relies on also contradicts his argument.  Specifically, in *Perry v. Workmen's Comp. Appeals Bd.*, 28 Cal. App. 3d 828 (1972), the court held that "[i]t is established under the provisions of the foregoing section that unless terminated by disability retirement[2] the employee is entitled to a full compensation at his existing salary for 52 weeks *regardless of whether the disability is temporary or permanent*."  *Id.* at 830 (internal quotations omitted)  (emphasis added).  The court therefore finds unpersuasive plaintiff's contention that "Section 4850 pay is only payable during periods of temporary disability."  (Pl.'s MSJ at 16:1-2.)

          The court acknowledges that defendants did not apprise plaintiff of their intent to consider Section 4850 pay until the day before the hearing.  While this circumstance raises a suspicion that defendants were "coming up with a new reason for rejecting the claims at the last minute," this, in and of itself, is insufficient to give rise to an abuse of discretion.  First, although plaintiff received notice that the issue of Section 4850 pay would be addressed at the hearing, plaintiff was not prejudiced because he did receive notice and attended the hearing, with counsel, and argued the merits of the Section 4850 offset.  (*See id.* at 7:20-8:18.)  Second, as set forth above, because there was evidence in the administrative record that plaintiff was disabled, defendants did not arbitrarily determine plaintiff was eligible for Section 4850 benefits, but never applied for it.  That defendants raised the issue of Section 4850 pay the day before the appeal is insufficient to constitute an abuse of discretion.

          For the reasons stated, plaintiff's long-term disability payments are properly offset by the amount of Section 4850 pay he would have been entitled to had he applied for those

/////

---

[2] The court notes that plaintiff, in this case, did retire on disability.  However, California case law expressly holds that a plan cannot force an employee into a disability retirement prior to exhaustion of Section 4850 pay.  *See City of Martinez v. Worker Comp. Appeals Bd.*, 85 Cal. App. 4th 601, 620 (2001).  Plaintiff therefore was still eligible to apply for, and receive, Section 4850 benefits, even though he was placed on disability retirement.

1  benefits.  Therefore, defendants' motion for summary judgment regarding Section 4850 pay is

2  granted and plaintiff's is denied.

3           C.       Workers' Compensation Settlement[3]

4                    Plaintiff contends his $18,000 workers' compensation benefit is not a proper

5  offset.  Plaintiff concedes that "if the Plan had filed and perfected a written lien, it would have

6  had the legal right to participate in any settlement negotiations [and] to object to any settlement

7  which unfairly valued its lien . . ."  (Pl.'s MSJ at 17:24-28.)  However, plaintiff argues, although

8  "he signed a Reimbursement agreement, an Authorization to Release information, and a

9  [c]onsent to the [p]lan placing a lien on his Workers' Compensation benefits," the settlement is

10 not a proper offset "[b]ecause the Plan never actually paid him any LTD benefits, the Plan took

11 no action to perfect its lien claim and never filed and served a written lien, as required by Labor

12 Code 4903.1(c)."  (*Id.* at 7:17-18.)  Plaintiff avers defendants' "own failure to file and perfect a

13 written lien precluded it from being a party to Barboza's Workers' Compensation proceeding."

14 (*Id.* at 18:8-10.)  Plaintiff's final argument is because he "only received reimbursement of future

15 medical expenses for his 1993 injury. . . . [t]here is no basis under the Plan to offset any amount

16 of his Workers' Compensation settlement."  (*Id.* at. 18:5-6.)

17                   Defendants counter that, although defendants advised plaintiff that any workers'

18 compensation settlement, absent CAPF approval, would be applied as an offset against Plan

19 benefits, he unilaterally settled all of his workers' compensation claims.  (Defs.' MSJ  at

20 12:13-20.)  Defendants therefore argue "[t]he $18,00 lump sum settlement payment . . . must be

21 offset against Barboza's LTD benefits." (*Id.* at 13:11-13.)  Defendants also contend plaintiff's

22 argument that the settlement merely bought out his future medical benefits is undermined by the

23 compromise and release, which expressly provides that "the intent of this settlement is to resolve

24 /////

25

26        [3] Because neither the Plan administrator, nor the CAPF appeals committee addressed this
     issue, the court reviews it de novo.

any and all aspects of all workers' compensation" and the release "may affect other benefits you are receiving or may become entitled to receive from other sources." (*Id.* at 13:19-28.)

Section 11.5(c) of the Plan provides an offset "under any compulsory benefit act or law including, without limitation, any state unemployment compensation disability benefit . . . or any negotiated substitute." (CAPF 86.) Section 11.5 also states that "[t]he Plan Member must repay to the Plan recovered excess amounts as specified in Section 12." (CAPF 85.) Section 12, in turn, provides that the Plan may recover from or offset future benefits against any and all Offsetting Benefits/Income Amounts, regardless of their characterization and including, without limitation, future medical claims. (CAPF 100.)

The $18,000 workers' compensation settlement plaintiff agreed to unilaterally, without informing defendants, is a proper offset under ERISA and the terms of the Plan. Plaintiff has not met his burden of demonstrating California Labor Code § 4903.1(c) applies to defendants. Section 4903.1(c) provides that "[a]ny lien claimant under Section 4903 or this section shall file its lien with the appeals board in writing upon a form approved by the appeals board." CAL. LAB. CODE § 4903.1(c). Section 4903 lists liens of varying nature. Plaintiff has, not, however, demonstrated defendants fall within any of the listed categories. Indeed, a review of the categories of liens set forth in Section 4903 demonstrates defendants, an ERISA welfare plan and its administrator, fall outside the reach of California Labor Code Section 4903.1(c).

The court also finds unavailing plaintiff's contention that "there is no basis under the Plan to offset any amount of [plaintiff's] Workers' Compensation settlement" because he "only received reimbursement of future medical expenses . . . ." (Pl.'s MSJ at 18:5-7.) Plaintiff's contention is contrary to the Plan language and the terms of the settlement. First, Section 12 of the Plan provides that the Plan "may recover from or offset future benefits against any and all Offsetting Benefits/Income Amounts, regardless of their characterization and including, without limitation, future medical claims." (CAPF 100.) Second, the settlement plaintiff agreed to states that "[t]he intent of this settlement is to resolve *any and all aspects of*

*all workers' compensation claims, . . .*" and informs plaintiff that "settlement of [his] workers'

compensation claim . . . may affect other benefits [he] . . . may become entitled to receive in the

future from sources other than workers' compensation, including . . . long-term disability

benefits." (Decl. of Maureen Burns, ECF 17, ¶ 2, Ex. 2 (emphasis added).)

The Plan language is clear: "Any amount the Plan member receives . . . under any

compulsory benefit act or law including without limitation, any state unemployment

compensation disability benefit law . . . or any negotiated substitute" is a proper offset of LTD

benefits. (CAPF 86.) Plaintiff entered into such a negotiated substitute when he settled his

workers' compensation claim for $18, 000 dollars.[4] The settlement agreement is a proper offset

of plaintiff's LTD benefits.[5]

D.      Plaintiff's Request for Statutory Penalties

Plaintiff seeks statutory penalties "in the amount of up to $110.00 per day"

because defendant did not provide plaintiff with a copy of the contract between CAPF and CAIS

and the "claim notes upon which the Administrator had relied on in denying" plaintiff's claim

"for approximately 1 year." (Pl.'s MSJ at 19:19-20:8.) Defendants counter that statutory

penalties are not appropriate because the contract "had no bearing on Barboza's claim, its denial

or the appeal," and the notes "were properly withheld on a claim of privilege." (Defs.' Opp'n at

---

[4] Plaintiff argues it would be "oppressive" to offset plaintiff's workers' compensation settlement. However, in an email dated April 28, 2008, defense counsel specifically apprised plaintiff's counsel that "any compromise and release or other settlement of workers' compensation benefits agreed to by [plaintiff] will be applied as an offset against Plan benefits unless the Plan Administrator expressly agrees to the settlement . . . ." (Decl. of Geoffrey White, ECF 16, EX 1.)

[5] Defendants' motion also seeks to offset plaintiff's alleged undisclosed gross revenue from self-employment. Defendants assert they "merely seek to obtain equitable relief for the fraud Barboza committed against the CAPF Plan by misrepresenting and concealing his income from self-employment and other employment." (Defs.' MSJ at 15:28-16:2.) Specifically, Defendants seek "to place an equitable lien on any sum that may be awarded to Barboza in this action so as to prevent him from benefitting through his fraudulent efforts to keep defendants from recovering appropriate offsets Barboza is supposed to hold in trust for defendants." (*Id.* at 17:13-16.) In this regard, defendants' argument dovetails with its counterclaim, addressed below.

18:8-17.)  Defendants also argue, even if the notes were not privileged, they "could not have had

any bearing on the claim decision as they were merely a recording of the decision making

process."  (*Id.* at 18:20-23.)  Plaintiff replies that "[t]he Ninth and other Circuits have repeatedly

held that the 'fiduciary exception' to the attorney-client privilege applies during the claim

administration process, until the final denial of the [a]ppeal." (Pl.'s Reply to Def.'s Opp'n at

9:4-6.)

Section 502(c)(1)(B) of ERISA provides that any plan administrator who does not

respond to a beneficiary's request for information in accordance with Title I of ERISA may be

liable to that beneficiary for statutory penalties of up to $100 a day.  11 U.S.C. § 1132(c)(1)(B).

ERISA section 104(b)(4) requires the plan administrator to, upon request, furnish to participants

and beneficiaries any relevant "trust agreement, contract, or other instruments under which the

Plan is established or operated."  29 U.S.C. § 1024(b)(4).  The Code of Federal Regulations

requires claimant be "provided, upon request and free of charge, reasonable access to, and copies

of, all documents, records, and other information relevant to the claimant's claim for benefits."

29 C.F.R. § 2560.503-1(h)(2)(iii).  A document is relevant if it is "generated in the course of

making the benefit determination."  *Id.* § 2560.503-1(m)(8)(ii).  The decision to assess statutory

penalties is within the sound discretion of the district court.  11 U.S.C. § 1132(c)(1)(B).

Here, the court, in its discretion, declines to assess the statutory penalties plaintiff

requests.  CAPF cannot be held liable under Section 502 because it is not the plan administrator.

*See Sgro v. Danone Walters of North Amer. Inc.,* 532 F.3d 940, 944-45 (9th Cir. 2008.)

("[S]ection [1132(c)(1)] only gives Sgro a remedy against the Plan 'administrator.'").

While CAIS may be liable for statutory penalties, the court finds such penalties

inappropriate in this instance.  First, the operating contract between CAIS and CAPF could not

have had any bearing on the administrator's original decision to deny plaintiff's claim, and thus,

could not have informed plaintiff as to how CAIS reached its decision.  *See Eden Surgical Ctr. v.*

*Budco Group, Inc.*, 2010 WL 2180360, at *7 (C.D. Cal. May 27, 2010) ("The documents sought

by Eden are expressly cited by the Plan as criteria that the Administrator uses for determining the Maximum Allowable Amount.  Without that information, a participant does not have all of the information he or she needs in order to know how claims are processed and reimbursements are calculated.").  In other words, the contract was not "generated in the course of making the benefit determination."  29 C.F.R. § 2560.503-1(m)(8)(ii).

The court also finds that plaintiff has not met his burden of demonstrating how CAIS relied upon the "claim notes" in reaching its decision.   Plaintiff simply states, in conclusory fashion, "the Administrator had relied [on the notes] in denying Barboza's claim, alleging he made certain statements over the telephone."  (Pl.'s MSJ at 20:6-7.)  Even though plaintiff was eventually provided the notes (Defs.' Opp'n 18:18-20), he does not direct the court to how defendant actually relied on the notes in reaching its decision on plaintiff's claim.

"The purpose for allowing plaintiff to examine the documents in her file is so that she can meaningfully participate in the review process . . . ."  *Palmer v. Univ. Medical Group*, 994 F. Supp. 1221, 1241 (D. Or. Jan. 16, 1998), *rev'd on other grounds,* 258 F.3d 986 (9th Cir. 2001).  Here, it is undisputed plaintiff was able to meaningfully participate in the appeals process.  Specifically,  CAIS apprised plaintiff of the precise basis for its original decision to deny plaintiff's claim in a letter dated May 18, 2007.  Prior to plaintiff's appeal, plaintiff's attorney said he and plaintiff "believe that [the] appeal submission contained detailed and complete evidence that Mr. Barboza was and continues to be disabled from his own occupation as a Fire Captain.  There was no evidence to the contrary in the claims file," and therefore they did not "anticipate attending the hearing" on plaintiff's appeal  (CAPF 19.)  Indeed, the appeals committee agreed, holding that plaintiff was disabled from his position as a fire captain and granted plaintiff's claim.  (CAPF 345.)  Based on the foregoing, the court finds statutory penalties inappropriate in this case.

/////

/////

1        E.      Plaintiff's Request for Injunctive Relief

2                Plaintiff seeks to enjoin the Plan's appeals procedures, arguing that, in reversing

3        the court's grant of defendants' motion for summary judgment on the basis of failure to exhaust

4        administrative remedies, the "Ninth Circuit expressly held that the Plan's appeals procedures did

5        not comply with the DOL regulations." (Pl.'s MSJ at 18:25-26.)   Defendants counter that

6        Barboza cannot seek injunctive relief because he continues to assert "a valid claim for wrongful

7        denial of benefits under § 1132(a)(1)(B)." (Defs.' Opp'n at 17:1-3.)   Defendants also argue a

8        party seeking injunctive relief must satisfy the traditional elements of such relief, and plaintiff

9        has not demonstrated "the likelihood of irreparable harm," "the balance of hardship favors the

10       movant" or "the public interest will be served by granting the injunction." (*Id.* at 17:13-7.)

11       Specifically, defendants maintain plaintiff "cannot establish the last three factors because he has

12       no evidence that the Plan continues to rely upon the quarterly-meeting rule or otherwise has

13       failed to render a decision within ninety days of the administrative appeal . . . ." (*Id.* at

14       17:18-21.)

15               Section 502(a)(3)(A) permits a party empowered to bring a civil action "to enjoin

16       any act or practice which violates any provision of this subchapter or the terms of the Plan."

17       29 U.S.C. § 1132(a)(3)(A).   A court may provide equitable relief under ERISA in order to place

18       plan participants in the position they would have been but for the violation. *Matthews v.*

19       *Chevron Corp.*, 362 F.3d 1172, 1186 (9th Cir. 2004).

20               Here, the Ninth Circuit found that the Plan violated ERISA by following the so-

21       called quarterly-meeting rule.   It specifically held that disability claims, such as Barboza's, must

22       be decided within 45 days (or ninety if qualified for an extension), unless it is a multi-employer

23       plan. *See Barboza*, 651 F.3d at 1080.   The Plan language, however, provides that "[a]

24       representative of the claims committee will notify the Claimant of the decision on the appeal

25       within sixty (60) days after the Plan's receipt of the appeal, unless a specific hearing or more

26       information is required." (CAPF 1-7.)   The Plan, therefore, according to the administrative

20

1   record currently before the court, is in violation of ERISA, in light of the Ninth Circuit's

2   decision in *Barboza*.  The court therefore finds plaintiff's request for injunctive relief under

3   ERISA appropriate.

4          The court also finds unavailing defendants' contention that injunctive relief is not

5   appropriate because "[plaintiff] has no evidence that the Plan continues to rely upon the

6   quarterly-meeting rule or otherwise has failed to render a decision within ninety days of a

7   claimant's administrative appeal . . . ."  (Defs.' Opp'n at 17:18-20.)  Defendants rely exclusively

8   on the declaration of its counsel, which states that counsel is "informed and believes" his clients

9   "have not relied upon" the now deemed improper, "quarterly meeting rule articulated in

10   29 C.F.R. § 2560.503-1(I) in any administrative appeal concerning a claim for disability benefits

11   since June 30, 2011."   (Declaration of Brendan Begley, ECF 83-2 ¶ 2.)  This declaration lacks

12   foundation and is insufficient to demonstrate defendants revised the Plan to comply with the

13   relevant provisions of ERISA.

14          Defendants are hereby ORDERED to revise the Plan language to remove the

15   "quarterly-meeting" provision such that the Plan complies with the Ninth Circuit's decision in

16   *Barboza*.

17   III.    <u>Plaintiff's Motion for Summary Judgment on Defendants' Counter Claim</u>

18          Defendants filed their amended answer on March 3, 2012, asserting a

19   counterclaim for an equitable lien under ERISA's provision permitting a plan fiduciary to "to

20   obtain other equitable relief."  (*See* Defs.' Countercl., ECF 64 at 12:6-8.)  Defendants assert that,

21   following *Sereboff v. Mid Atlantic Medical Services, Inc*., 547 U.S. 356 (2006), they are entitled

22   to "an equitable lien on any monetary relief Plaintiff is awarded in this instant action" because

23   "[p]laintiff failed to disclose that he was and is receiving income from self-employment. . . ."

24   (*Id.* at 12:11-13:2.)

25          Plaintiff offers a number of arguments in support of his motion for summary

26   judgment on defendants' counterclaim: (1) plaintiff argues defendants do not have standing to

1    bring the claim; (2) defendant waived the right to offset any amount plaintiff earned from self-

2    employment because they did not raise it in the administrative process; (3) defendants have no

3    basis for equitable relief because they have yet to distribute to plaintiff any LTD payments; and

4    (4) defendant cannot offset any amount plaintiff earned from self-employment because plaintiff

5    did not garner any profit from those endeavors.  The court addresses each of plaintiff's

6    arguments in turn below.

7         A.      <u>Standing</u>

8         Plaintiff argues defendants are not plan fiduciaries, and thus, do not have

9    standing to bring their claim for equitable relief under Section 502(a)(3) (29 U.S.C. §

10   1132(a)(3)) of ERISA.  (Pl.'s CC MSJ at 5:11-12.)  Plaintiff maintains that, "[u]nder the CAPF

11   Plan document, the Plan is managed by its Board of Directors, and CAISI pays benefits under

12   the supervision of the board.  Similarly, the Bylaws of CAPF expressly state the Board of

13   Directors are the named fiduciaries to exercise corporate powers, including the power to bring

14   suit."  (*Id.* at 5:3-6.)  Therefore, plaintiff asserts, defendants are not "fiduciaries" entitled to bring

15   suit "to obtain other appropriate equitable relief."  29 U.S.C. § 1132(a)(3)(b).

16         Defendants concede that "none of the named defendants [is] considered

17   'fiduciaries' for all intents and purposes"; nevertheless, defendants maintain "[p]laintiff has

18   misrepresented the law when it comes to whether each of the [d]efendants may be considered a

19   'fiduciary,' which they are, for limited purposes."  (Defs.' Opp'n to Pl.'s CC MSJ, ECF 82 at

20   4:25-28.)  Defendants argue they have standing to bring suit because "a plan fiduciary may

21   delegate its responsibilities."  (*Id.* at 5:1-2.)  Defendants argue "[h]ere, for example, pursuant to

22   the [Administrative Services Agreement], CAISI [the Plan administrator] has the power to take

23   any action which is reasonably requested by the board of the corporation members from time to

24   time."  (*Id.* at  5:5-8.)

25         Title 29 U.S.C. § 1132(a)(3) provides that "[a] civil action may be brought by a

26   participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any

1   provision of this subchapter or the terms of the Plan, or (B) to obtain other appropriate equitable

2   relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the

3   terms of the Plan."  It is axiomatic that "a federal court has no jurisdiction to hear a civil action

4   under ERISA that is brought by a person who is not a 'participant, beneficiary, or fiduciary.'"

5   *Local 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 981 (9th Cir. 1999) (citing

6   *Harris v. Provident Life & Accident Ins. Co.*, 26 F.3d 930, 933 (9th Cir.1994)).  However,

7   ERISA also provides that a fiduciary may allocate its fiduciary responsibilities.  29 U.S.C. §

8   1105(c).

9          ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in functional

10   terms of control and authority over the Plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262

11   (1993) (emphasis in original).

12          [A] person is a fiduciary with respect to a plan [governed by
           ERISA] to the extent (i) he exercises any discretionary authority or
13          discretionary control respecting management of such plan or
           exercises any authority or control respecting management or
14          disposition of its assets, ... or (iii) he has any discretionary
           authority or discretionary responsibility in the administration of
15          such plan.

16   29 U.S.C. § 1002(21)(A); see *Credit Managers Ass'n v. Kennesaw Life & Accident Ins. Co.*,

17   809 F.2d 617, 625-26 (9th Cir. 1987) ("An ERISA fiduciary includes anyone who exercises

18   discretionary authority over the Plan's management, anyone who exercises authority over the

19   management of its assets, and anyone having discretionary authority or responsibility in the Plan's

20   administration.").

21          While the "ERISA plan itself does not have standing to sue under § 502(a) of

22   ERISA because it is not a plan participant, beneficiary or fiduciary," *Nor-Cal Plumbing*, Inc.,

23   185 F.3d at 981, the same is not true of CAIS and CAPF.  Specifically, the Plan delegated

24   "discretionary authority or discretionary control respecting management of [the] plan,"

25   "disposition of its assets," or "discretionary responsibility in the administration of [the] plan."  29

26   U.S.C. § 1002(21)(A).  CAIS, as set forth above, is the plan administrator, with numerous

1    discretionary responsibilities, including, but not limited to, "claims coordination services,

2    including lien recovery." (*See* Administrative Services Agreement ("ASA") § 3.2, attached as

3    exhibit four to the declaration of Geoffrey White, ECF 74.) The Plan itself provides that CAPF's

4    claim committee may hear appeals of CAIS's denial of a claim for benefits. (CAPF 107.) This

5    evidence demonstrates that both CAPF and CAIS had discretionary responsibility over the

6    administration of the Plan and the claims process, and thus, both are fiduciaries entitled to seek

7    relief on behalf of the Plan as provided by Section 502(a)(3) of ERISA.[6]

8        B.    Offsets

9            1.    Waiver of Right to Seek

10            Plaintiff also argues defendants had a fiduciary duty to investigate any potential

11   offsets but did not do so, and thus, are now barred from raising those offsets in this litigation.

12   (Pl.'s CC MSJ at 6:23-26.) Plaintiff insists the burden was on the Plan to request information

13   regarding any potential offsets, but defendants did not "develop the facts necessary to decide

14   Barboza's claim fully during the administrative process," and thus, violated their fiduciary duties.

15   (*Id.* at 7:27-8:11.) Plaintiff argues ERISA "requires the Plan to afford 'a full and fair review' of

16   the administrator's denial of Barboza's claim." Plaintiff maintains ERISA therefore requires

17   "[d]efendants to assert all reasons for the denial or limitation of Barboza's benefits in the claims

18   administration process." (*Id.* at 8:13-17.)

19            Defendants counter that they properly investigated plaintiff's claim, but plaintiff's

20   misleading and false responses to their inquiries regarding plaintiff's earnings from self-

21

22        [6] Plaintiff also argues CAIS is not a fiduciary because, "while the ASA says that CAIS
     may have some discretion in the initial decision to grant or deny benefit claims, it remains
23   subject to the supervision of the board of directors." (Pl.'s CC MSJ at 6:1-3.) It is true that
     according to the ASA, CAIS "shall perform its duties under the supervision and control of the
24   Board of Directors of the Corporation . . . and in accordance with the terms of the Plan." (ASA
     § 3.3) It does not therefore follow, however, that CAIS did not have discretionary responsibility
25   in administering the Plan. This limiting language simply delineates that "any discretionary
     action taken by the Administrator shall be subject to the ultimate review by the Corporation,"
26   which is exactly what happened in this case. (*Id.*)

employment thwarted their efforts.  (Defs.' Opp'n to Pl.'s CC MSJ. at 5:15-24.)  Plaintiff did not

provide defendant with tax returns indicating self-employment until late 2011, and did not inform

defendants that he waived benefits under California Labor Code Section 4850.  (*Id.* at 6:5-11.)

Moreover, defendants argue they are not introducing new reasons for denying his claim, but

rather "now seek recover[y] of offsets he was obligated to hold in trust because [d]efendants did

not learn of, much less identify precisely, the offsets in the course of adjudicating his claim for

benefits."  (*Id.* at 6:22-27:28.)  As such, defendants argue, the court's review should not be

confined to the administrative record.

    Plaintiff's argument on this point is unavailing.  First, the cases plaintiff relies on

are inapposite.[7]  Those cases held that a plan administrator cannot conjure new reasons for

denying a claim during an offset.  Here, conversely, "[t]he CAPF claims committee determined

that the claim should be accepted," but "subject to reduction and offsets according to the

provision of the Plan."  (CAPF 345.)

    Moreover, defendants here are not seeking a new reason to deny a claim, but rather

seek equitable relief after the claims process, which is clearly cognizable under ERISA Section

502(a)(3) and the case law interpreting the same.  In *Sereboff*, the Supreme Court permitted an

ERISA plan to place an equitable lien on distributions paid to the plan participant because the

plan beneficiary was eventually able to recover from a third-party tortfeasor by way of settlement.

*Sereboff*, 547 U.S. at 363.  The court held that equitable relief under Section 502(a)(3) was

appropriate because "Mid Atlantic sought specifically identifiable funds that were within the

possession of the Sereboffs — that portion of the tort settlement due Mid Atlantic under the terms

of the ERISA plan, . . ."  *Id.*  Similarly, here, defendants, by way of their counterclaim, seek to

place an equitable lien on funds they contend are specifically identifiable:  plaintiff's income from

---

[7] For example, plaintiff cites to *Harlic v. Blue Shield of Cal.*, 656 F.3d 832 (9th Cir. 2011) *rev'd on other grounds* for its contention that "[d]efendants may not now sandbag Barboza with new claims after suit commences."  (Pl.'s CC MSJ at 8:17-19.)

self-employment, which comprises funds identified as proper offsets under the terms of the Plan. As such, defendants' counterclaim constitutes an appropriate attempt to obtain an equitable lien over funds defendants maintain plaintiff should have disclosed during the administrative process. Whether or not such equitable relief is appropriate under these circumstances, however, is a separate question.

### 2.   Extent of Lien Allowable

Plaintiff further argues that defendants here have not paid plaintiff "a nickel in benefits," in contrast to typical claims for equitable relief, such as where a plan seeks to recover benefits distributed after a subsequent third-party tort settlement, or a social security payment. (Pl.'s CC MSJ at 16:23-17:1.)   Plaintiff asserts, "under the terms of the Plan . . . general equitable principles require that the Plan has no right of recovery until after benefits have been paid." (*Id.* at 17:10-10-11.)   Plaintiff also argues, under *Sereboff*, defendants must direct the court to a specifically identifiable fund in plaintiff's possession.  Here, plaintiff maintains, any potential judgment upon which defendants seek to place a lien is neither identifiable nor in plaintiff's possession.  (*Id.* at 17:15-22.)

Defendants counter that "overpayment of benefits is [not] a requirement for a plan fiduciary to obtain equitable relief sought by defendants."  (Defs.' Opp'n to Pl.'s CC MSJ at 11:2-4.)  Defendants argue their claim satisfies the test set forth in *Sereboff*.  First, they insist "the funds [d]efendants seek to lien are directly identifiable since they are no more than the benefits already awarded albeit not yet tendered to [p]laintiff along with any additional benefits that may be applicable in the court's judgment."   Second, defendants maintain that "such funds have not dissipated as no benefits have been tendered and no judgment has been awarded in this ongoing matter."  (*Id.* at 11:20-26.)  Finally, defendants argue equitable relief is appropriate because it is the only manner in which the court can ensure defendants are "left with [an] avenue to redress the misrepresentations and fraudulent non-disclosure that plaintiff has committed." (*Id.* at 12:1-4.)

/////

26

Section 502(a)(3) permits fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the Plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the Plan." 29 U.S.C. § 1132(a)(3).  Here, CAIS and CAPF are fiduciaries seeking to enforce the terms of the "other income sources" provision of the Plan.  Section 502(a)(3)  "authorize[s] only 'those categories of relief that were typically available in equity.'"  *Sereboff,* 547 U.S. at 361 (quoting  *Mertens v. Hewitt Associates*, 508 U.S. 248, 265 (1993)).  The pertinent question, then, is whether the relief defendants seek is equitable in nature.

In *Sereboff,* the Court held that, in order to demonstrate the remedy sought is equitable, the party seeking relief must demonstrate  the funds sought are specifically identifiable and were within the possession and control of the party against whom relief is sought.  *Id.* at 362-63.  The court reasoned that "ERISA provides for equitable remedies *to enforce plan terms*," and because the party pursuing equitable relief "sought its recovery through a constructive trust or equitable lien on a specifically identified fund," the relief sought was equitable in nature."  *Id.* at 363 (internal quotations omitted) (emphasis in original).

The Court, relying on *Barnes v. Alexander*, 232 U.S. 117 (1914), went on to explain  "the familiar rule of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing."  *Id.* at 363 (internal quotations omitted).  This rule allowed Mid Atlantic to "follow a portion of the recovery into the Sereboffs' hands as soon as the settlement fund was identified, and impose on that portion a constructive trust or equitable lien."  *Id.* at 364 (internal quotations omitted).  Important for purposes of this case, the court explained that the equitable lien or constructive trust was imposed by agreement; that is,  the plan's contractual third-party provision automatically created a lien "by agreement" when the participant agreed to the plan terms.  *See id.* at 365-66 ("[T]he fund over which a lien is asserted need not be in existence when the contract containing the lien provision is executed."); *see also Mayhew v. Hartford Life and Accident Ins. Co.*, 822 F. Supp.2d 1028, 1032

1   (N.D. Cal. 2011) (agreeing with the plan that, under *Sereboff*, "the Plan created an equitable lien

2   by agreement"); *Pollock v. Northrop Grumman Health Plan*, 2011 WL 1399792, at *3, 5

3   (permitting counterclaim for overpaid LTD benefits where the plan provided "the payments you

4   receive under the . . . LTD plans are offset dollar for dollar by other disability income benefits

5   you receive.").

6            It is undisputed that, during the administrative process, plaintiff misrepresented

7   that he had not worked in any other occupation and that he was not self-employed.[8]  Defendants

8   now seek equitable relief to enforce the provision of the Plan listing as a benefit reduction and

9   offset "[a]ny amount the Plan members receives as . . . earnings for work services (including

10  self[9]-employment) performed by a plan member . . . ."  (CAPF  85-86.)  By agreeing to this

11  provision, plaintiff agreed to defendant's placing an equitable lien by agreement over any income

12  plaintiff received from self-employment, even though the "fund over which [the] lien [was]

13  asserted [was not] in existence when the contract containing the lien provision [was] executed.'"

14  *Sereboff,* 547 U.S. at 366.  The fund is specifically identifiable as the amount plaintiff earned

15  from self-employment.  The fund was also in plaintiff's possession when he garnered income

16  from self-employment.  Therefore, assuming plaintiff's income from self-employment falls within

17  the Plan's "other income provision," defendant is entitled to an equitable lien over those sums.

18  /////

19

20        [8] Plaintiff contends he did not purposefully misrepresent, but rather "did not consider
      himself as self-employed despite owning an Alpaca ranch . . . because he only worked 6 to 8
21    hours per week" and only worked for Sierra Railway intermittently.  (Pl.'s Opp'n to Defs.' MSJ
      at 7:25-8:1.)  Plaintiff's intentions, however, are irrelevant: if plaintiff's outside work falls
22    within the Plan's provision for offsetting other income sources, equitable relief under Section
      503(a)(3) is appropriate.
23
          [9] Plaintiff argues the funds are not in his possession because all of his earnings from self-
24    employment have dissipated.  (Pl.'s CC MSJ at 17:23-18:2.)  But "[defendants'] equitable lien
      attached when [Plaintiff] came into possession of" the earnings from self-employment."
25    *Mayhew*, 822 F. Supp. 2d at 1032.  That plaintiff's income from self-employment has dissipated
      does not eliminate defendants' right to offset those earnings from self-employment that fall
26    within the Plan provision.

1          The next question, then, is whether the terms of the Plan entitle defendants to

2   offset plaintiff's earnings from self-employment.  Plaintiff concedes that "Barboza's self-

3   employment in connection with his alpaca ranch generated . . . $197,705 in 2007 and 2008"; that

4   "[h]is self-employment in other areas generated $26,443"; and that "Barboza also derived $1,713

5   in . . . income through employment at Sierra Entertainment and Sierra Northern Railways . . . ."

6   (Defs.' MSJ at 15:12-21.)  Defendants do not dispute that, after costs of doing business, plaintiff

7   received zero net profit from his self-employment.

8          C.      Self-employment Revenue

9          Plaintiff's final argument is that defendants' attempt to offset all plaintiff's "gross

10  revenue" from his self-employment is unreasonable.  Specifically, plaintiff argues the Plan term

11  "earnings" and common-sense interpretation denote net-income, not gross revenue.  (Pl.'s CC

12  MSJ at 13:2-16:13.)  Therefore, Barboza argues there should be no offset based on his earnings

13  from self-employment because, according to his tax returns, there was no net income from

14  self-employment.  (*Id.* at 12:17-19.)  Defendants maintain their interpretation of "benefits" is

15  reasonable.  "Defendants CPA stated that the Plan does not require offsets for self-employment

16  earnings to be reduced by claimed business losses or expenses, and that such earnings may be

17  measured by gross income, not net income."  (Defs.' Opp'n to Pl.'s CC MSJ at 9:24-10:1.)

18  Defendants also cite to Blacks Law Dictionary which defined "earnings" as "[t]hat which is

19  earned; i.e. money earned from performance of labor" which is "broader in meaning than

20  'wages.'"  (*Id.* at 10:6-11.)

21          Courts must interpret ERISA plans "in an ordinary and popular sense as would a

22  person of average intelligence and experience."  *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437,

23  1441 (9th Cir. 1990) (quoting  *Allstate Insurance Co. v. Ellison*, 757 F.2d 1042, 1044 (9th

24  Cir.1985)).  However, where "a reasonable interpretation favors the insurer and any other

25  interpretation would be strained, no compulsion exists to torture or twist the language of the

26  policy."  *Allstate*, 757 F.2d at 1044.  Where, as here, "the Plan is silent as to the definition of the

[relevant term], we look to the dictionary definition to determine the ordinary and popular meaning." *Gilliam*, 488 F.3d 1189, 1195 (9th Cir. 2007). The court is also "guided by the policies expressed in ERISA and other federal labor laws." *Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007). The court must "endeavor to interpret each provision consistent 'with the entire document . . . .'" *Id.* (quoting *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991).

The court finds defendants' interpretation of "earnings" as denoting all gross revenue garnered from self-employment is untenable both semantically and in the context of the Plan itself.[10] The Oxford English Dictionary defines earnings as "[t]he action of giving labour as an equivalent for wages, of acquiring money by labour" and "gain, profit." OXFORD ENGLISH DICTIONARY (2012) (available online). Merriam-Webster's defines earnings as "the balance of revenue after deduction of costs and expenses." Merriam-Webster's Online Dictionary. Black's defines earnings as "revenue gained from labor or services, from the investment of capital, or from assets." BLACK'S LAW DICTIONARY, 548 (9th ed. 2009).

That the ordinary dictionary definitions of the term "earnings" denotes net profit, and wages, supports plaintiff's contention, that the "ordinary and popular" interpretation of earnings denotes only net income and not gross revenue. That Black's contains a broader definition not precisely in line with other dictionary definitions is not sufficient to demonstrate that defendants' interpretation of earnings as gross revenue prior to deductions for costs and expenses is reasonably in line with how a person of average intelligence and experience would define the term.

---

[10] The court notes that defendants format as a block quote what is identified as section 11.5 of the Plan, to suggest it provides that "Offsetting Benefit/Income Amounts include . . . self-employment earnings (which are calculated by gross revenue and not by net income), . . ." (Defs.' Opp'n to Pl.'s CC MSJ at 3:7-9.) A cursory review of Section 11.5 and its various subsections, however, discloses the block quote does not track the actual plan language, which provides instead that "*earnings* for work or services" constitutes a proper offset. (CAPF 86) (emphasis added). Nowhere does the Plan state that earnings constitute gross revenue and not net income.

The court also finds that defining "earnings' as gross revenue, and not net income, is inconsistent with the Plan as a whole.  The purpose of the Plan "is to provide death and disability benefits to members of fire departments.  The benefits provided under the terms of the Plan are fully integrated and reduced by other benefits including, without limitation, retroactive or continuing pensions, workers' compensation awards and payments and awards from insurance companies or third parties, . . . ."  (CAPF 56.)  The other offsetting benefits integrated into the Plan represent positive income a participant could potentially receive.  Conversely, under defendants' interpretation, a participant could actually lose money in an endeavor, and the Plan can still offset the total amount earned regardless of the costs of doing business, leaving the participant without the necessary life-supporting income the Plan is intended to provide.  *See* D. Hill, *Employer-Sponsored Long Term Disability Insurance*, MONTHLY LABOR REVIEW, July 1987, at 18.  ("The purpose of offset provisions is to provide an adequate level of replacement income, while avoiding duplicative or excessive benefits.")

Defendants' interpretation of earnings also is out of sync with the prevailing definitions used by labor  agencies.  The National Labor Relations Board, in explaining appropriate deductibles for back pay, explained that "only net earnings from self-employment are considered to be interim deductibles"; "net earnings are the difference between gross receipts and offsetting expenses." NATIONAL RELATIONS BOARD CASE HANDLING MANUAL, Pt. 3, Section 10552.3.  The Social Security Administration also uses "net earnings from self-employment" to determine whether "social security retirement benefits should be reduced."  *See Mason v. Barnhart*, 406 F.3d 962, 964 (8th Cir. 2005) (citing 20 C.F.R. § 404.415(a)).  Based on the foregoing, the court finds the plain and ordinary definition of earnings, the meaning of earnings within the context of the Plan as a whole, and the prevailing definition of earnings expressed in other federal labor laws, comports with plaintiff's definition of earnings as net income, not gross revenue from self-employment.

/////

The court also finds misplaced defendants' reliance on Certified Public Accountant Steve Campbell's interpretation of earnings as gross income from self-employment. Mr. Campbell stated in his declaration that he "was contacted by Louis A. Gonzales, legal counsel for CAPF and CAISI, and asked to confirm whether, from an accounting perspective, the offset earnings that a Plan member derives from self-employment should be measured by gross income generated in such endeavors or by the amount of net income that a Plan member claims from such endeavors." (Campbell Decl., attached as Exhibit I to the Begley Decl., ECF 75-7 at 11, ¶ 4.)   As such, Mr. Campbell constitutes an expert witness that should have been, but was not, properly disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2)(A).  (Pl.'s Objections, ECF 90 at 3.)  The court also declines to consider the Campbell declaration because it includes an impermissible legal conclusion by an expert.  *See Nalbandian v. Lockheed Martin Corp.*, 2011 WL 3881473, at *5 n.1 (N.D. Cal. Sept. 1, 2011) (declining to consider " export report because it contained "legal conclusions regarding interpretation of the [ERISA] Plan, functioning best as supplemental briefing for the Plaintiffs.")

Because plaintiff did not derive any net income from his self-employment, it is not a proper offset under Section 11.5(d) of the Plan.  Therefore, an equitable lien over the $192,705 of gross revenue from plaintiff's alpaca farm and $26,443 in gross income from other self employment "to enforce . . . the terms of the Plan" is not appropriate.  29 U.S.C. § 1132(a)(3).

However, the $1,173 plaintiff admits he earned working for Sierra Entertainment and Sierra Northern Railways (*see* Pl.'s Opp'n to Defs.' MSJ at 8 n.1), is a proper offset under Section 11.5(d) of the Plan.  Specifically, wages earned from labor performed for an outside employer fall squarely within the ordinary and plain meaning of earnings.  Under ERISA Section 502(1)(3), defendant is entitled to an equitable lien over the $1,173 plaintiff received from labor performed by the Sierra companies.

/////

/////

IV.    Conclusion

The parties' cross-motions for summary judgment are granted in part and denied in part.  Specifically, defendant is ordered to distribute to plaintiff the remainder of the LTD benefits plaintiff is currently owed after offsetting for benefits to which he was entitled under Section 4850 of the California Labor Code and the $18,000 workers' compensation settlement into which he entered.

Defendant's motion for summary judgment regarding plaintiff's earnings from self-employment is denied as to the $192,705 of gross revenue from plaintiff's alpaca farm and $26,443 in gross income from other self employment but granted as to the $1,173 plaintiff received from employment with Sierra Entertainment and Sierra Northern Railways.

Plaintiff's motion for summary judgment as to his request for statutory penalties is denied.

Plaintiff's motion for summary judgment as to his request for injunctive relief is granted.  Defendant is hereby ordered to revise the Plan's appeals procedure to comply with the Ninth Circuit's decision in *Barboza v. Cal. Ass'n Prof'l Firefighters*, 651 F.3d 1073 (9th Cir. 2011).

Plaintiff's motion for summary judgment on defendants' counterclaim is granted in part and denied in part.  Specifically, plaintiff's motion is granted as to the $192,705 of gross revenue from plaintiff's alpaca farm and $26,443 in gross income from other self employment but denied as to the $1,173 plaintiff received from employment with Sierra Entertainment and Sierra Northern Railways.

DATED:  September 30, 2012.

UNITED STATES DISTRICT JUDGE